UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

CIVIL ACTION NO. 1:00-CV-00186-M

HOLLEY PERFORMANCE PRODUCTS, INC.                              PLAINTIFF

V.

SPECIALTY AUTO PARTS U.S.A., INC.                              DEFENDANT

### Memorandum Opinion and Order

Plaintiff, Holley Performance Products, Inc. ("Holley"), manufactures high-performance carburetors for use in street and racing automobiles. It has been in the business of manufacturing and selling carburetors in the United States since 1903. (Compl. [DN 35-2] ¶ 8; Decl. of Shane Weckerly [DN 35-1] ¶ 2.) Defendant, Specialty Auto Parts U.S.A., Inc. ("Specialty"), is one of Holley's competitors. It also manufactures and sells carburetors. (Compl. [DN 35-2] ¶¶ 15-16.)

On September 21, 2000, Holley sued Specialty, alleging that it "misappropriated the trade dress of Holley's carburetor main bodies." (Id. ¶ 6.) In specific, Holley highlighted six aesthetic features that were "inherently distinctive trade dress features," including: (1) a connection for a choke/air horn; (2) the design of six flat surfaces for identification stamps; (3) color; (4) the design of the support ribbing; (5) the color scheme of gaskets; and (6) the marking system for internal parts. (Id. ¶ 11.) Specialty denied that it misappropriated the trade dress of Holley's carburetor main bodies. It also asserted counterclaims against Holley. (Ans. & Countercl. [DN 25-3].) Ultimately, the parties entered a "Compromise and Settlement Agreement and Release" on August 31, 2001. (Comp. & Settl. Agr. & Release ("Settl. Agr.") [DN 25-4].) As a result of this agreement, the case was dismissed with prejudice. (Order [DN 22].) This matter is now before the Court on Specialty's Motion for Summary Enforcement of Certain Settlement Provisions [DN 25].

1

## I. Jurisdiction

As an initial matter, the Court must determine whether it has jurisdiction to enforce the parties' settlement agreement. The Court finds that it does. "Federal courts generally do not retain jurisdiction to enforce settlement agreements because those disputes implicate state law and have little to do with the original controversy that invoked federal subject-matter jurisdiction." GATX Corp. v. Appalachian Fuels, LLC, 2011 WL 4015573, at *1 (E.D. Ky. Sept. 9, 2011) (citing Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377-81 (1994)). A district court may retain jurisdiction over a settlement, however, by expressly including a provision retaining jurisdiction in the order of dismissal or incorporating the settlement agreement's terms in the order. See Hehl v. City of Avon Lake, 90 Fed. App'x 797, 801 (6th Cir. 2004); Re/Max Int'l, Inc. v. Realty One, Inc., 271 F.3d 633, 641-42 (6th Cir. 2001). In this case, the parties' agreement contains a provision stating that the Court "shall retain jurisdiction to enforce the terms of this Agreement." (Settl. Agr. [DN 25-4] ¶ 1.) This provision was incorporated into the order of dismissal. (See id. ¶ 2.) Thus, the Court finds that it has jurisdiction. See also Limbright v. Hofmeister, 566 F.3d 672, 674-76, n.2 (6th Cir. 2009) (holding that a court may rely on any basis of jurisdiction to enforce a settlement agreement that produced the dismissal of an earlier suit, and noting that "summary enforcement ensures that the judge enforcing the settlement agreement is familiar with the parties and the underlying suit, and it avoids the delays inherent in having a newly filed case adjudicated").

## II. Discussion

In this matter, Specialty argues that Holley breached the parties' agreement "through two different, but related, types of conduct." (Mem. of Law in Supp. of Def.'s Mot. for Summ. Enf. of Certain Settl. Provisions ("Def.'s Mem.") [DN 25-1] 1.) First, Specialty argues that Holley violated Paragraphs 7(c) and 7(d) of the agreement by "offering certain carburetors with main

bodies that have abandoned the identification configuration and method that Holley had agreed to follow pursuant to the Settlement Agreement." (Id. at 2.) Second, Specialty argues that Holley violated Paragraphs 3, 6, and 7(b) of the agreement by "recently alleging a raft of trade-dress claims against Specialty—claims that Holley expressly released pursuant to the same Settlement Agreement." (Id.) The Court will consider each of these arguments below.

### A. PARAGRAPHS 7(C) AND 7(D): IDENTIFICATION CONFIGURATION

In the parties' settlement agreement, Specialty and Holley included provisions that were designed to prevent customer confusion between Specialty's carburetor main body product and Holley's HP line of carburetors (with which Specialty's product could be used in conjunction). Specialty agreed that beginning 90 days after the date of the agreement, it would:

> not manufacture, sell, or distribute any carburetor main bodies that can be used with other components of a complete Holley carburetor . . . unless such main bodies have the following permanent features:
>
> 1) The face containing the identification surfaces has a substantially different configuration of identification surfaces cast into the main body. One such substantially different configuration is the configuration shown on Exhibit A to this Agreement.
>
> 2) The words "Proform", "Specialty Auto" (or any other trade name authorized by Specialty), are cast, machined, or stamped into the main body.

(Settl. Agr. [DN 25-4] ¶ 6(a).) Holley, by contrast, agreed that it would "cast or stamp the word 'Holley' on one of the six flat surfaces on all HP main bodies manufactured for it." (Id. ¶ 7(c).) Holley also agreed to "manufacture all of its HP line of main bodies with 6 identification surfaces cast into the main body in substantially the configuration shown in Exhibit B." (Id. ¶ 7(d).)

Specialty now argues that Holley has violated Paragraphs 7(c) and 7(d) of this agreement by "offering certain carburetors with main bodies that have abandoned the identification configuration and method that Holley had agreed to follow . . . ." (Def.'s Mem. [DN 25-1] 2.) In

3

specific, Specialty argues that Holley has violated the agreement by offering carburetor main bodies in its HP line that do not have the "6 identification surfaces cast into the main body in substantially the configuration shown in Exhibit B." In support of this argument, Specialty highlights a Holley HP carburetor which Holley began offering in mid-2011 that fails to have any identification surfaces and similarly fails to cast or stamp the word "Holley" onto one of those surfaces. (Id. at 7; Pictures of Holley HP Main Body [DN 25-5].) According to Specialty, Holley has marketed this carburetor as having an "updated main body design" which has "[a]ll unnecessary mounting bosses [i.e. the 6 identification surfaces] removed for a smoother, cleaner appearance." (See Website Description of Aluminum Ultra HP Carburetor [DN 25-7].)

Holley responds that it has not violated either Paragraph 7(c) or Paragraph 7(d) of the parties' agreement. According to Holley, it "has produced, and to this day still produces, its HP carburetor main bodies with the required trade dress elements." (Pl.'s Opp. to Def.'s Mot. for Summ. Enf. ("Pl.'s Opp.") [DN 35] 1.) Holley argues that Specialty's complaint "lies not with Holley's HP line of carburetor main bodies, but with the fact that Holley designed a **new** line of carburetor products, the **Aluminum Ultra HP** line . . . ." (Id.) Holley argues that the parties' agreement did not preclude Holley from designing or producing new carburetors, nor did it freeze Holley out of incorporating new trade dress elements in new product lines. (Id. at 1-2.)

In support of its argument, Holley first notes that when the parties entered the settlement agreement, Holley manufactured numerous lines of carburetor main bodies apart from, and distinct from, its HP line, several of which did not include the six identification surfaces as found in the trade dress of the HP line. (Id. at 7.) In specific, Holley highlights six lines that did not include the surfaces—namely, its original Dominator line; single barrel line; two-barrel line; four-barrel line; marine lines; and lines for original equipment manufacturers, such as Harley Davidson. (Id.)

4

Holley argues that none of the carburetor main bodies in these product lines were affected by the settlement agreement. Instead, the agreement only impacted "HP main bodies," or "its HP line of main bodies." (Settl. Agr. [DN 25-4] ¶¶ 7(c), 7(d).) According to Holley, when the agreement was entered, the only main body comprising the "HP line" that was interchangeable with Specialty's main body was Holley's HP 4150 main body. (Decl. of Shane Weckerly [DN 35-1] ¶ 13.) Holley thus proposes that when the agreement mentioned "HP main bodies," or the "HP line of main bodies," it was referring solely to the HP 4150 main bodies (or the HP 4150 line).

Holley states that in February of 2004, while it was still manufacturing its HP 4150 line of products, it introduced a new line of carburetors that it called its "Ultra HP line" or "Aluminum Ultra HP line." (Pl.'s Opp. [DN 35] 8.) Holley states that this new line of carburetor products used billet aluminum component parts and a Teflon-coated throttle lever. (Id.) In 2010, Holley began redesigning this new line of carburetors. Holley states that to help its customers associate the new design as its own, it specifically designed the main body so that "Holley" and the new-script "HP" are cast onto the body's side. Holley argues that the new-script "HP," with the tail coming off the "P," is only used in conjunction with the marketing of Holley's new line: the "Ultra HP line" or the "Aluminum Ultra HP line." (Id. at 8-10.) Holley also argues that while its HP line of carburetors and its Aluminum Ultra HP line of carburetors share the "HP" root in their name, they are very different lines of carburetors created with different materials and containing different design features. (Id. at 15-18.) Further, according to Holley, since the parties' agreement explicitly limits itself to the HP line of main bodies, the requirement for Holley to incorporate the six identification surfaces does not extend to Holley's Aluminum Ultra HP line. (Id. at 20.)

Specialty disagrees with Holley's argument that the "Ultra HP" or "Aluminum Ultra HP" carburetors comprise a "new line" of carburetors. Specialty instead categorizes the "Ultra HP" or

5

"Aluminum Ultra HP" carburetors as part of Holley's "HP line." (See Reply in Supp. of Def. Specialty Auto Parts U.S.A., Inc.'s Mot. for Summ. Enf. of Certain Settl. Provisions ("Def.'s Reply") [DN 44] 3.) It is undisputed that the parties' agreement applied to "all of [Holley's] HP line of main bodies." (Settl. Agr. [DN 25-4] ¶ 7(d).) Specialty argues that because the main bodies which Holley characterizes as "Ultra HP" or "Aluminum Ultra HP" are marked as "HP" main bodies and have "HP" in their product names, they are part of Holley's "HP line." (Def.'s Reply [DN 44] 3.) Specialty argues that Holley's "HP line" includes the entire range of Holley's "HP" main bodies and carburetors, regardless of specific variations among the various flavors of the HP name. Specialty argues that variations based on the style of font, the size, the materials, or the design do not remove a labeled "HP" product from the "HP line." (Id. at 3-4.)

"Kentucky law is clear that words in a contract are to be given their 'ordinary meaning as persons with the ordinary and usual understanding would construe them.' . . . Kentucky courts often refer to dictionaries in order to determine the ordinary meaning of undefined contractual terms." Ayers v. C & D Gen. Contractors, 237 F. Supp. 2d 764, 770 (W.D. Ky. 2002) (citations omitted). Here, the parties' dispute centers on the meaning of the word "line." In dictionaries, "line" is defined as "a stock of commercial goods of the same general class but having a range of styles, sizes, prices, or quality." Definition of "Line," No. 28, http://dictionary.reference.com/ browse/line?s=t. "Line" is also defined more generally as, "[i]n manufacturing, a series of closely related products." Black's Law Dictionary, Definition of "Line," No. 3 (9th ed. 2009); see also Merriam-Webster, Definition of "Line," No. 11, www.m-w.com/dictionary/line (defining "line" as "merchandise or services of the same general class for sale or regularly available"); Oxford Dictionary, Definition of "Line," No. 4.6, www.oxforddictionaries.com/us/definition/american_ english/line?q=line (defining "line" as a "range of commercial goods").

6

Based on these definitions, the Court finds that Specialty's argument is more persuasive. Under the ordinary and usual understanding of the term, a "line" is a range, a series, or a stock of products. The words "range," "series," and "stock" each indicate that a "line" is comprised of multiple products. Indeed, contrary to Holley's position, each new product with different design features does not automatically create its own new "line." As such, the Court finds that Holley's "HP line" must necessarily be comprised of the entire range of Holley's HP main bodies and carburetors, regardless of the variations among the different HP products' styles and qualities. Further, the Court finds that because Holley's 4150 HP main bodies and Aluminum Ultra HP carburetors are of the same general class of goods, and because both products are marketed as "HP" products, Holley's "HP line" includes both products, despite their differences. Indeed, the design differences between Holley's 4150 HP main bodies and Aluminum Ultra HP carburetors are mere variations among different products that make up the "HP line."

In this respect, the Court agrees with Specialty that Holley's interpretation of the parties' settlement agreement violates a fundamental tenet of contract construction. (See Def.'s Reply [DN 44] 4.) As a general rule, "a court in its interpretation should attempt to give meaning to all the provisions of a contract." Cincinnati Gas & Elec. v. F.E.R.C., 724 F.2d 550, 555 (6th Cir. 1984). In other words, "[c]ontract interpretation that 'entirely neutralizes one provision should not be adopted if the contract is susceptible of another which gives effect to all its provisions.'" Paris Packaging, Inc. v. Flint Grp. N. Am. Corp., 2011 WL 5122639, at *3 (W.D. Ky. Oct. 28, 2011) (citations omitted). In this case, Holley agreed to "manufacture **all of its HP line** of main bodies with 6 identification surfaces cast into the main body . . . ." (Settl. Agr. [DN 25-4] ¶ 7(d) (emphasis added).) The Court finds that Holley's argument that this agreement was meant to cover only the HP 4150 main body effectively neutralizes the terms "all" and "line," which

contemplate that the parties intended their agreement to cover more than one type of HP product. It seems to the Court that if the parties had intended their agreement to cover only the HP 4150 main body, they would have so stated.

The Court also agrees with Specialty that Holley's argument contains certain internal contradictions. As noted above, Holley argues that by adding the term "Ultra" (or the phrase "Aluminum Ultra") to "HP," it essentially removed the main bodies from the "HP line," as the agreement was intended only to cover the "HP 4150 line of main bodies." (Pl.'s Opp. [DN 35] 8, 13-14.) However, Holley does not explain why, on the one hand, a main body is in the "HP line" despite the addition of the term "4150" to "HP"—yet, on the other hand, adding the word "Ultra" or "Aluminum" to "HP" somehow excludes the Aluminum Ultra HP main body from the "HP line." (Def.'s Reply [DN 44] 5.) The Court finds that the agreement is not ambiguous, and that the only permissible reading of it, which gives meaning to all its terms, is that it covers **all** main bodies that include the "HP" brand in its name, including the Aluminum Ultra HP carburetor.

A cursory review of a picture of the Aluminum Ultra HP carburetor supports the Court's holding. The Aluminum Ultra HP carburetor is cast with the name "Holley HP." This casting indicates that the carburetor is, in fact, part of Holley's "HP line." As noted above, Holley states that it "specifically designed the Aluminum Ultra HP main body so that Holley and the new-script 'HP' are cast on to the side of the main body." (Pl.'s Opp. [DN 35] 9-10.) Holley further states that the new-script "HP" with the tail coming off the "P" is only used in conjunction with the marketing of Holley's Aluminum Ultra HP line, thereby implying that the new-script "HP" proves that the main bodies are not part of the HP line. (See id.) But as Specialty accurately highlights, the parties' agreement contains no language limiting the "HP line" to only HP main bodies which use a standard block-type font. (Def.'s Reply [DN 44] 8-9.)

Indeed, the Court finds that the fact that Holley chose a new-script to complement its "new design" does not establish a new line. Holley freely chose to brand the Aluminum Ultra HP carburetor as an "HP" carburetor, as opposed to including it in some other line or coming up with a new name for it. Therefore, Holley was obligated to comply with the parties' agreement. To do so, Holley could have: (a) found a way to implement the six identification surfaces (with the word "Holley" stamped or cast on one of those surfaces) on the Aluminum Ultra HP carburetor; (b) positioned the main bodies and carburetors, with all of their design improvements, in a line other than the "HP" line; or (c) chosen a new name for the main bodies and carburetors that did not include "HP" (i.e. the "Ultra" or "Aluminum Ultra" carburetor). By foregoing these options and instead choosing to market the carburetor as an "HP" carburetor, Holley essentially chose not to comply with Paragraphs 7(c) and 7(d) of the parties' agreement. Therefore, to the extent that Specialty seeks a finding that Holley has breached Paragraphs 7(c) and 7(d) of the settlement agreement, Specialty's motion [DN 25] is **GRANTED** in part.

### B. PARAGRAPHS 3, 6, AND 7(B): LITIGATION DESPITE RELEASE

In the parties' settlement agreement, Specialty and Holley each agreed to "release[] the other from all liability for the claims asserted in this suit and any other claim which either party might have against the other with respect to the subject matter of this suit, whether asserted in this suit or not." (Settl. Agr. [DN 25-4] ¶ 3.) Further, Holley agreed that any "[c]arburetor main bodies manufactured by Specialty . . . that conform to the provisions of part 6 [of the agreement] do not infringe any alleged trade dress or trademarks of its carburetor main bodies and Holley will not accuse the parts nor the users or manufactures thereof of infringing Holley's trademarks or such trade dress." (Id. ¶ 7(b).) Paragraph 6 required Specialty to manufacture its main bodies with identification surfaces in a "substantially different configuration" than Holley's. (Id. ¶ 6(a).)

9

Specialty argues that Holley has violated these provisions by bringing trade dress-related claims against it in the matter of Holley Performance Prods., Inc. v. Quick Fuel Tech., Inc., et al., No. 1:07-CV-185-M (W.D. Ky.) ("Quick Fuel"). (Def.'s Mem. [DN 25-1] 9-12.) Specialty argues that in that case, Holley alleged "a number of claims that were expressly released under the Settlement Agreement," (id. at 10), including claims that Specialty "designed, manufactured and marketed carburetors whose trade dress is substantially identical to or, at the very least, confusingly similar to the Holley Carburetor Trade Dress . . . ." (4th Am. Compl. [DN 25-10] ¶ 79.) In support of its argument, Specialty highlights that in Holley's complaint in this action, Holley alleged that Specialty copied its trade dress feature of the "[d]esign of support ribbing . . . on the exposed sides of all Holley carburetor main bodies," which design featured "four ribs on each outside edge of the main body, and five ribs on the bottom edge." (See Compl. [DN 25-2] ¶ 11(d).) Similarly, in the more recent Quick Fuel action which was pending against Specialty[1], Holley alleged that it had trade dress rights for "the speed strakes on the side of the main body." (4th Am. Compl. [DN 25-10] ¶ 38(c).) Specialty argues that this is a re-assertion of the same claims. In addition, Specialty argues that Holley has "asserted other trade dress rights against Specialty that relate to certain main body elements," despite the fact that Holley agreed that it would not accuse such parts (or the manufactures thereof) of infringing on its trade dress as long as Specialty's main bodies conformed to the agreement. (Def.'s Mem. [DN 25-1] 11.)

Holley responds that it has not violated Paragraphs 3, 6, and 7(b) of the parties' agreement. According to Holley, the initial litigation between it and Specialty was based on Specialty's sale of a component part (i.e. a replacement main body) for genuine Holley carburetor products. After the agreement, Specialty made the decision to manufacture complete carburetors. Holley argues

---

[1] On April 16, 2014, the Court issued an order in the action [DN 334], dismissing the Fourth Amended Complaint, with prejudice, as to Specialty. Holley Perf. Prods., Inc. v. Quick Fuel Tech., Inc., No. 1:07-CV-185-M (W.D. Ky.).

10

that the agreement only applied to Specialty's alleged infringement of the trade dress of Holley's main bodies—and that the agreement did not prevent it from addressing any post-settlement infringement of the trade dress of entire Holley carburetors. (Pl.'s Opp. [DN 35] 23-26.)

In addition, Holley argues that Specialty's motion "ignores the fundamental principle that in analyzing trade dress, the elements of the product's appearance must not be isolated and examined individually, but must be considered as a whole." (Id. at 23 (citing Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1042 (2d Cir. 1992) (noting that in examining trade dress, "the focus is on the entire look of the product or packaging")).) In specific, Holley argues that Specialty improperly isolates one of the elements on a component of the carburetor (i.e. the "speed strakes on the side of the main body") to argue that because this "trade dress" element could have been asserted in the initial litigation, the settlement agreement sanctions Specialty's complete carburetors and their features. Holley argues that this rationale is incorrect. Instead, Holley argues that the parties' agreement "simply resolved a dispute about properly identifying and distinguishing the source of individual replacement parts for Holley carburetors and has no bearing on the sale of complete carburetors . . . ." (Id. at 24.)

The Court agrees with Specialty that Holley violated Paragraphs 3, 6, and 7(b) of the parties' agreement when it brought certain trade dress-related claims against Specialty in the Quick Fuel litigation. As noted above, in Paragraph 3 of the agreement, Holley explicitly agreed to "release[] [Specialty] from all liability for the claims asserted in this suit and any other claim which either party might have against the other with respect to the subject matter of this suit, whether asserted in this suit or not." (Settl. Agr. [DN 25-4] ¶ 3.) It cannot be disputed that this suit involved certain aesthetic design features which were "inherently distinctive trade dress features." (See Compl. [DN 35-2] ¶ 11.) Similarly, it cannot be disputed that the subject matter

11

of this suit was Specialty's alleged misappropriation of these trade dress features. Therefore, the Court holds that to the extent that Holley asserted (or could have asserted) trade dress-related claims against Specialty and its main bodies in this action, it released Specialty from liability. Further, under Paragraph 7(b) of the parties' agreement, Holley was prohibited from asserting (or re-asserting) such claims against Specialty in the more recent Quick Fuel action.

In the Quick Fuel action, Holley did assert (or re-assert) trade dress-related claims against Specialty that it was prohibited from asserting. Specifically, Holley asserted certain trade-dress related claims in the Quick Fuel action which related to main body elements that existed at the time this initial action was filed. For example, as Specialty noted, Holley alleged in this action that Specialty copied its feature of the "[d]esign of support ribbing . . . on the exposed sides of all Holley carburetor main bodies," which design featured "four ribs on each outside edge of the main body, and five ribs on the bottom edge." (Compl. [DN 25-2] ¶ 11(d).) Similarly, in the Quick Fuel action, Holley alleged that it had trade dress rights for "the speed strakes on the side of the main body." (4th Am. Compl. [DN 25-10] ¶ 38(c).) The Court finds that this was a re-assertion of a claim Holley released in Paragraph 3 of the parties' agreement.

In addition, the Court finds that Holley violated the agreement to the extent it asserted other trade dress rights against Specialty in the Quick Fuel action which related to main body elements of Specialty's carburetors that existed at the time this initial action was filed. This is because Holley also released those claims in Paragraph 3 of the parties' agreement. In sum, the Court agrees with Specialty that Holley did violate the settlement agreement. Holley's argument that the agreement had no bearing on the sale of complete carburetors by Specialty is without merit. After all, complete carburetors do, in fact, have main bodies and main body elements. To the extent that Specialty seeks a finding that Holley has breached Paragraphs 3, 6, and 7(b) of the

parties' settlement agreement, Specialty's motion [DN 25] is **GRANTED** in part. Notably, however, the Court finds that Holley did not breach Paragraph 3, Paragraph 6, or Paragraph 7(b) to the extent that it alleged trade dress-related claims in the Quick Fuel action which had no bearing on the main body elements of Specialty's carburetors—or to the extent it alleged claims which had a bearing on main body elements, but which related to elements that were not in existence as of the time of the previous litigation. Further, to the extent that Holley alleged other, non-trade dress-related claims in the Quick Fuel action, such as its conspiracy claim, those claims did not in violate the agreement.

### C. SPECIALTY'S REQUESTED RELIEF

In its motion for summary enforcement, Specialty argues that since Holley has breached Paragraphs 7(c) and 7(d), the Court must: (1) compel Holley to comply with the settlement agreement by (a) manufacturing "all of its HP line of main bodies with 6 identification surfaces cast into the main body in substantially the configuration shown in Exhibit B" and (b) casting or stamping the word "Holley" on one of the six flat surfaces on all HP bodies; (2) enjoin Holley from any further manufacturing, sales, or distribution of its HP main bodies (alone or in combination with carburetor assemblies) that do not comply with the parties' agreement; and (3) order Holley to immediately withdraw from the market all of its HP main bodies (and carburetors assembled therewith) that do not comply with the parties' agreement. (See Def.'s Mem. [DN 25-1] 15-16.) Specialty also argues that the Court must: (4) order Holley to retrieve its existing inventory of all HP main bodies (and carburetors assembled therewith) that do not comply with the parties' agreement; (5) order Holley to immediately inform all customers that any products which were sold to them that do not comport with the parties' agreement are in violation of the agreement and may no longer be offered or sold; (6) order Holley to buy back all of its inventory

of Holley products that do not comply with the parties' agreement and reimburse customers for applicable shipping and handling costs; (7) order Holley to provide an accounting to Specialty showing all revenues from the sale or distribution of products that do not comply with the parties' agreement; (8) order Holley to forfeit all of such revenues to Specialty; and (9) award Specialty costs and fees, including attorney fees, that it incurred in having to bring this motion.

In addition, Specialty argues that because Holley has breached Paragraphs 3, 6, and 7(b), the Court must: (1) order Holley to stipulate to dismissing, with prejudice, certain of the trade dress-related claims in the Quick Fuel matter; (2) enjoin Holley from bringing any future claims that Holley might have against Specialty with respect to the subject matter of this suit, including trade dress-related claims; (3) enjoin Holley from accusing Specialty of infringing any Holley trade dress as to carburetors that Holley has allowed Specialty to manufacture, distribute, sell, or otherwise use in compliance with the settlement agreement; (4) award Specialty its costs and fees, including the attorney fees it incurred in bringing this motion for summary enforcement; and (5) award Specialty damages, including costs and the attorney fees it incurred as a result of being forced to defend itself, in violation of the settlement agreement, against trade dress-related claims that Holly alleged in the Quick Fuel suit. (See Def.'s Mem. [DN 25-1] 17-18.)[2]

Holley argues that this sweeping relief is unwarranted, as Specialty requests more than a simple ruling from the Court ordering that Holley violated the parties' agreement and precluding Holley from asserting some of its trade dress-related claims in the Quick Fuel action. (Pls.' Opp. [DN 35] 22, 26 n.10.) Instead, Specialty asks the Court to, among other things, order Holley to

---

[2] Due to the order of dismissal entered in the Quick Fuel litigation, the parties have filed a joint stipulation [DN 71] regarding Specialty's motion. The parties stipulate that the order of dismissal rendered moot certain provisions of the relief requested in the motion with respect to Holley's alleged violations of Paragraphs 3, 6, and 7(b), including: (a) the request to order Holley to stipulate to dismissing, with prejudice, the trade dress and related claims in the Quick Fuel case; and (b) the related request to enjoin Holley from accusing Specialty of infringing any Holley trade dress—but only with respect to those trade dress-related claims that were asserted in the Quick Fuel case. (Joint Stipulation [DN 71] 2.)

withdraw certain products from the market, inform customers of the violation of the parties' agreement, reimburse customers for shipping and handling costs, provide Specialty with an accounting of revenues from the sale or distribution of products that do not comply with the parties' agreement, and award those revenues to Specialty. (Id. at 22.) According to Holley, Specialty has not tied this extensive requested relief to any measure of damages proximately caused by the alleged breach. For example, Holley states that Specialty has not offered evidence of any confusion between Holley's new Aluminum Ultra HP carburetors and any of Specialty's products—yet it still demands that Holley account for all of the revenues associated with its new product and turn them over to Specialty. Holley argues that such relief is not warranted.

Specialty responds that Holley does not dispute the equitable relief requested—and that as for its damages, it would limit its damages "to its costs and attorney's fees incurred as a result of being forced to defend itself against the improperly asserted trade dress claims . . . ." (Def.'s Reply [DN 44] 15.) Specialty states that this can be determined at a separate damages phase.

The Court finds that the record is not sufficiently developed to allow it to make an informed decision as to the proper relief to award in this case. Accordingly, the Court will refer the matter to the Magistrate Judge to develop the record and issue a report and recommendation as to the appropriate relief to award in this case, if any.

### III. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Specialty's Motion for Summary Enforcement of Certain Settlement Provisions [DN 25] is **GRANTED** in part and **DENIED** in part. It is **GRANTED** to the extent Specialty seeks a holding that Holley violated Paragraphs 7(c) and 7(d) of the parties' agreement—and to the extent Specialty seeks a holding

15

that Holley violated Paragraphs 3, 6, and 7(b) of the agreement. It is **DENIED** to the extent that Specialty asks the Court to enter its requested relief.

      **IT IS FURTHER ORDERED** that the issue of relief is **REFERRED** to the Magistrate Judge.

      *[signature]*
      **Joseph H. McKinley, Jr., Chief Judge**
      **United States District Court**

May 12, 2014

cc: counsel of record